UNITED STATES DISTRICT COURT
SOUTHERN OF NEW YORK

| | |
|---|---|
| ———————————————————— x | |
| CHRIS H. CALOTO, Individually and on Behalf of All Others Similarly Situated, : | Civil Action No.   1:23-cv-11086 |
| : | |
| : | CLASS ACTION |
| Plaintiff, : | |
| : | |
| : | COMPLAINT FOR VIOLATIONS OF THE |
| vs. : | FEDERAL SECURITIES LAWS |
| : | |
| PAYCOM SOFTWARE, INC., CHAD : | |
| RICHISON, and CRAIG E. BOELTE, : | |
| : | |
| Defendants. : | |
| : | |
| ———————————————————— x | DEMAND FOR JURY TRIAL |

Plaintiff Chris H. Caloto ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Paycom Software, Inc. ("Paycom" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Paycom common stock between February 9, 2022 and October 31, 2023, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act, because certain of the acts and practices complained of herein occurred in this District. Paycom, which services its customers through operations in all 50 states through business offices located in 28 states, maintains extensive operations in this District through its two Manhattan offices, including its New York headquarters located in One Penn Plaza. Paycom is also listed and trades on the New York Stock Exchange ("NYSE").

- 1 -

5.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

6.      Plaintiff Chris H. Caloto purchased Paycom common stock as set forth in the accompanying certification, incorporated herein by reference, and has been damaged thereby.

7.      Defendant Paycom provides cloud-based human resources and payroll functions, what it calls "human capital management ('HCM')" solutions delivered as software-as-a-service for small to mid-sized companies throughout the United States.  Paycom common stock was listed and traded on the NYSE, an efficient market, throughout the Class Period under the ticker symbol "PAYC."  As of October 24, 2023, there were more than 60 million shares of Paycom common stock issued and outstanding.

8.      Defendant Chad Richison ("Richison") is, and was at all relevant times, Paycom's founder, President, Chief Executive Officer ("CEO"), and Chairman of its Board of Directors.

9.      Defendant Craig E. Boelte ("Boelte") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Paycom.

10.      Defendants Richison and Boelte are referred to herein as the "Individual Defendants." Paycom and the Individual Defendants are referred to herein, collectively, as "defendants."

11.      Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Paycom.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Paycom common stock was a success, as it: (i) deceived the investing public regarding Paycom's prospects and business; (ii) artificially inflated the price of Paycom common stock; and (iii) caused plaintiff and other members of the Class (defined herein) to purchase Paycom common stock at inflated prices.

## BACKGROUND

12.     Defendant Paycom, founded in 1998, offers what it calls "functionality and data analytics that businesses need to manage the complete employment lifecycle, from recruitment to retirement."  The Company's HCM solutions provide a suite of applications in the areas of talent acquisition, including applicant tracking, candidate tracker, background checks, on-boarding, e-verify, and tax credit services; and time and labor management, such as time and attendance, scheduling/schedule exchange, time-off requests, labor allocation, labor management reports/push reporting, geofencing/geotracking, and Microfence, a proprietary Bluetooth.  Its HCM solutions also offer payroll applications comprising better employee transaction interface, payroll and tax management, payroll card, Paycom pay, expense management, mileage tracker/fixed and variable rates, garnishment management, and GL concierge applications; and talent management applications that include employee self-service, compensation budgeting, performance management, position management, and Paycom learning and content subscriptions, as well as my analytics, which offer employment predictor reporting.  In addition, its HCM solutions provide manager on-the-go that gives supervisors and managers the ability to perform a variety of tasks, such as approving time-off requests and expense reimbursements; direct data exchange; ask here, a tool for direct line of communication to ask work-related questions; document and checklist; government and compliance; benefits administration/benefits to carrier; COBRA administration; personnel action and performance discussion forms; surveys; and affordable care act applications, as well as Clue, which securely collect, track, and manage the vaccination and testing data of the workforce.

13.     In July 2021, Paycom officially rolled out a new application called "Beti," which stands for Better Employee Transaction Interface, as an enhancement to the Company's then-existing payroll offerings.  According to Paycom then, Beti "further automates and streamlines the payroll process by empowering employees to do their own payroll, increasing efficiencies and

reducing errors," adding that "[e]mployees already manage all other components of their paychecks, including timecards, expenses, PTO requests and benefits; now they have the convenience within Paycom to process their own payroll, too." And according to Paycom at that time, "Beti puts the payroll responsibility into the hands of employees, eliminating what used to be a multistep, imperfect and time-consuming process for HR and payroll staff members." What Paycom did not disclose at the time was that its revenue stream then relied heavily upon those very inefficiencies, especially charging fees for making additional payroll runs when mistakes were made in payroll departments. And thus that as the Company continued its rollout of Beti, more and more of the fees the Company had previously been deriving for fixing one-off payroll errors would be eliminated, causing its own revenues and profit margins to decline.

14.     Though the Company earns different subscription and service fees for providing different aspects of its services to customers, Paycom has always operated in a single, undifferentiated operating segment and it has reported all of its financial results in a single, undifferentiated reporting segment throughout the Class Period.

**MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

15.     The Class Period starts on February 9, 2022. On February 8, 2022, after the close of trading, Paycom issued a press release and conducted a conference call announcing its fourth quarter and fiscal 2021 financial results for the period ended December 31, 2021 ("4Q21" and "FY21"), the first full fiscal year after the rollout of Beti. In addition to reporting 4Q21 "[r]evenues of $285.0 million," representing a "29.0% [increase] year-over-year," along with "GAAP net income of $48.7 million,"[1] the release quoted defendant Richison as stating that Paycom had "'delivered very strong results in 2021, reflecting outstanding execution and robust demand for Paycom's differentiated

---

[1]     "GAAP" means Generally Accepted Accounting Principles.

solution,'" and emphasizing that its "'employee usage strategy, where employees are now able to do their own payroll with Beti™, *helped deliver record annual revenue* retention,'" adding that "'[c]ombining this with the momentum we are seeing and the sales and marketing investments we've made, *we believe we are set up to deliver strong, high-margin revenue growth for years to come*.'" As to the Company's financial guidance for its first quarter 2022 ending March 31, 2022 ("1Q22"), the release stated that Paycom then expected "[t]otal [r]evenues in the range of $342 million to $344 million" and "[a]djusted EBITDA in the range of $161 million to $163 million." For the fiscal year ended December 31, 2022 ("FY22"), Paycom stated that it then expected "[t]otal [r]evenues in the range of $1.314 billion to $1.316 billion" and "[a]djusted EBITDA in the range of $524 million to $526 million."

16.     During the conference call held with investors and stock analysts later that afternoon, defendant Richison opened his remarks by stating how "2021 was a very strong year for Paycom," emphasizing that it had "extended [its] platform to the employee even further through innovations like BETI," while failing to disclose that as Paycom's payroll customers increased their adoption of Beti, how much they were paying for one-off services such as additional correctional payroll runs, much less how much the Company had been relying upon those additional one-off fees in the past to drive revenue growth and profit margins. When asked about how Beti adoption was going by a stock analyst, defendant Richison responded by stating in pertinent part that "all new business that we've brought on since July of last year all have BETI included in its pricing and usage expectation." Later defendant Richison engaged in the following colloquy with another stock analyst, again concealing the negative impact that adoption of Beti was already having on Paycom's own financial results – much less the impact that further adoption would have:

> [Daniel William Jester BMO Capital Markets Equity Research – Software Analyst:] Got you. And then just to wrap up on BETI. When the product went live,

- 5 -

Chad, you made some comments about how long you thought it would take to get full penetration into the base. Now that we've seen sort of the growth in the adoption, any updated thoughts about how that progression is going to evolve?

[Richison:] I still feel strongly about what I said in the past. I mean BETI, ensures perfect payrolls. It ensures you're not going to have manual checks. You're not going to have voids. You're not going to have employees with overdrafts and everything else. *So we continue to have a lot of success deploying BETI*, and I still expect that all of our clients will be using BETI at some point.

17. The market price of Paycom common stock increased on these positive statements, closing up approximately $30 per share on February 9, 2022 at $363.20 per share, on unusually high volume of more than 1.2 million shares trading, or more than twice the average daily volume over the preceding ten trading days.

18. On May 3, 2022, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 1Q22 financial results. In addition to reporting "[r]evenues of $354 million, up 30% from the comparable prior year period," and "GAAP [n]et [i]ncome of $92 million," the release quoted defendant Richison as stating that Paycom had "'opened the year with *excellent results* and strong sales momentum, which has me even more confident in our strategy,'" adding that "'[e]mployee usage continues to drive *our very strong revenue growth*,'" while failing to disclose the negative aspects of increased Beti use. As to financial guidance, for the second quarter 2022 ending June 30, 2022 ("2Q22"), Paycom projected "[t]otal [r]evenues in the range of $308 million to $310 million" and "[a]djusted EBITDA in the range of $111 million to $113 million." For FY22, Paycom now projected "[t]otal [r]evenues in the range of $1.333 billion to $1.335 billion" and "[a]djusted EBITDA in the range of $533 million to $535 million," which had increased from FY22 guidance provided on February 8, 2022.

19. During the conference call held with investors and stock analysts later that afternoon, defendant Richison opened his remarks by emphasizing the successful launch of Beti for the Company's payroll customers while concealing the negative impact it was then having on Paycom's

own financial results, stating that "[i]ncreasing employee usage is a key component of the ROI that our clients realize and *we believe our employee usage strategy is* a competitive advantage *and a driver of our very strong growth*," adding that "[a]lready well over 1/4 of our clients have implemented and/or in the process of implementing BETI."

20.     Later during the Q&A portion of the conference call, defendant Richison was specifically asked about the impact Beti adoption was then having on Paycom's own financial results, and he again pivoted to the value being derived by Paycom's payroll customers while concealing the negative impact it was then having on Paycom's own financial results, stating instead as follows:

> [Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:]  Congratulations on the excellent results. Wondering, can you talk a little bit about the BETI conversions that you've had so far?  *And what sort of revenue uplift you've seen*?  And then what is – what's been the change in terms of the level of client engagement and satisfaction and early reads in terms of retention trends among those clients?

> [Richison:]  Yes.  I mean, well, from a rolling out BETI, we started doing that in July for all new clients.  All quotes – for all quotes given in July, those quotes all had BETI, and so it was a part of our ongoing strategy.  And so the reason I'm saying that is the way a new client would approach BETI is a little bit different than the way a current client would approach BETI.

> And what I mean by that, a current client does have to go through a bit of conversion, and they're not necessarily in a conversion mode the way a new client, they're already in a conversion mode.  And so there's a little bit difference there in how we work with one or the other, but we're also getting a lot better at deploying, making those conversions and helping the client set up their data sets that they have to feed into BETI in order to make it work for them payroll after payroll.

> And so in answer to your question from a retention, absolutely, the more of a product business is used in our case, the more products that they use, the longer they stay and the happier that they are.  So we're having a lot of success getting BETI out there.

> [Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:]  Chad, *do you get a revenue lift on the clients that you are converting to BETI*?  And if so . . . .

[Richison:]  *We do.  Yes.  BETI – yes.  BETI provides an incremental revenue opportunity for us*.  It's a – as I said in the past, it's a nominal fee.  It's 1 of 29 modules, *but we do get a revenue uplift each time we sell BETI to a current client*.  Or if we sell BETI to a new client, their pricing includes BETI, *and so that would be a larger fee than what it would have been prior to BETI being included*.

21.     Defendant Richison also adamantly maintained that Paycom was aware of any financial repercussions to Paycom of additional Beti adoption by its existing payroll customers and that was built into the Company's forecasts, stating in pertinent part as follows:

[Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:]  And so in terms of expectations, what's built into your expectations in terms of conversions among the client base that currently doesn't have BETI through the balance of the year?  And then as it relates to the rate question and the float income, to what extent would you let *that incremental benefit* flow through to the operating line as opposed to investing in it?

[Richison:]  Well, taking the latter first.  We're always trying to invest.  I mean, our first opportunity is to invest in growth.  And so we're always looking to do that, but we're also very disciplined in what we do.  The first question was, as far as – is BETI built into our forecast as far as what we're looking to do.  I mean *it's been built into our forecast the whole time*.  I've been very aggressive about the expectations about our hopes for bringing BETI in.

22.     On August 2, 2022, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 2Q22 financial results.  In addition to reporting "[r]evenues of $317 million, up 31% from the comparable prior year period" and "[n]et [i]ncome of $57 million,'" the release quoted defendant Richison as stating that Paycom's "'very strong second quarter results further illustrate the quality of the fundamentals of [its] business."  The release once again failed to disclose the negative impact those customer gains were then having on Paycom's own financial results, though defendants did disclose that Paycom's gross margin had declined from 85.0% in 2Q21 to 84.2% in 2Q22.  As to financial guidance, for its third quarter 2022 ending September 30, 2022 ("3Q22"), Paycom projected "[t]otal [r]evenues in the range of $327 million to $329 million" and "[a]djusted EBITDA in the range of $117 million to $119 million."  For FY22,

Paycom again raised its financial guidance, now projecting "[t]otal [r]evenues in the range of $1.354 billion to $1.356 billion," and "[a]djusted EBITDA in the range of $546 million to $548 million."

23.     During the conference call held with investors and stock analysts later that day, lauding the benefits of continued Beti adoption while concealing the negative financial impacts it was then having on Paycom's own financial results, defendant Richison stated that "already over 13,000 clients or nearly 40% of our client base have embraced BETI," emphasizing "*[t]hat's great progress*," and that "[w]ith only 5% share of a growing TAM, we have a long runway for *continued high-margin revenue growth for years to come*."  Defendant Richison concluded his opening remarks by stating that "[o]ur differentiated solutions and go-to-market strategy, *particularly with BETI*, are working well in driving new client growth and *higher revenue per client*."

24.     During the Q&A session of the conference call, defendant Richison again extolled the purported financial benefits of Beti adoption to Paycom's own financial results, stating in pertinent part as follows:

> [Alexander Kim Mizuho Securities USA LLC, Research Division – Research Analyst:]  . . .  I had a question about BETI.  You talked about 10,000 clients uptaking BETI in Q1 and this quarter, you have about 13,000 clients.  What drove the 3Q net adds?  And what sort of per employee per module uptake is part of BETI?  And what kind of *growth upside* do you see from BETI adoption?  Like can you answer that?  And I have a follow-up.

> [Richison:]  Yes. . . . [A]s a reminder, since July of last year, every new client that's come on our system has deployed BETI. . . .

> And then as far as the opportunity, that upselling into our client base has with BETI, it is *incremental increase in revenue opportunity* for us, *so it's accretive to that profile*.  But in every year, we have different focuses on modules, so – and this year, and I'm sure in the next year, we're going to continue to be focusing on upselling BETI to 100% of our client base.

> And *again, it'll be positive*.

*     *     *

[Kevin Damien McVeigh Crédit Suisse AG, Research Division – MD:] Great.  *Is* there *any way to frame what the revenue impact is if you were – if BETI was adopted 100% across your existing client base*.  So said another way, *what's the revenue impact as BETI becomes 100% utilized across the client base*.

[Richison:]  Well, BETI is 1 of 29 modules that we have.  *So I mean it would definitely have an impact*.  Again, where we're making the impacts new business logo adds, and BETI gives us the opportunity to do that.  *I think BETI will have some impact for sure because we're charging for it*.  But I think where you'll see a better impact to BETI once we have every single client on, I mean I think it's going to impact retention.

25.     On August 15, 2022, Paycom issued a press release announcing it was increasing its stock buy-back program, with defendant Richison justifying those repurchases by emphasizing that "'Paycom's . . . *predictable cash flow* give us the confidence to be aggressive buyers of our stock . . . .'"  The market price of Paycom common stock would continue trading at fraud-inflated prices on defendants' materially false and misleading statements, reaching a Class Period high of more than $402 per share in intraday trading on August 15, 2022.

26.     On November 1, 2022, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 3Q22 financial results.  In addition to reporting "[r]evenues of $334 million, up 30% from the comparable prior year period" and "[n]et [i]ncome of $52 million," the release quoted defendant Richison as stating that Paycom's "'very strong results reflect outstanding execution and robust demand for self-service, user-friendly solutions in payroll and human capital management,'" while again failed to disclose the negative impact those customer gains were *then* having on Paycom's own financial results.  As to financial guidance, for its fourth quarter 2022 ending December 31, 2022 ("4Q22"), Paycom projected "[t]otal [r]evenues in the range of $366 million to $368 million" and "[a]djusted EBITDA in the range of $144 million to $146 million."  For FY22, again raising its financial guidance, Paycom stated it was then projecting "[t]otal [r]evenues in the range of $1.371 billion to $1.373 billion," and "[a]djusted EBITDA in the range of $560 million to $562 million."

27.     During the conference call held with investors and stock analysts later that afternoon, defendant Richison opened his remarks by emphasizing that Paycom had "delivered another very strong quarter with a focus on ***high-quality revenue growth that produces world-class margins***," adding that Beti had then been adopted by "***nearly half of***" Paycom's payroll customers, while concealing the disparate impact that increased adoption had already occasioned.

28.     On February 7, 2023, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 4Q22 and FY22 financial results.  In addition to reporting 4Q22 "[r]evenues of $371 million, up 30% year-over-year," along with "GAAP [n]et [i]ncome [of] $80.0 million," the release quoted defendant Richison as stating in pertinent part that Paycom had "'delivered outstanding results in 2022, with ***accelerating revenue growth*** and ***strong margins***.'"  As to the Company's financial guidance for its first quarter 2023 ending March 31, 2023 ("1Q23"), the release stated that Paycom then expected "[t]otal [r]evenues in the range of $443 million to $445 million" and "[a]djusted EBITDA in the range of $210 million to $212 million."  For FY23, Paycom stated that it then expected "[t]otal [r]evenues in the range of $1.700 billion to $1.702 billion" and "[a]djusted EBITDA in the range of $700 million to $702 million."

29.     During the conference call held with investors and stock analysts later that afternoon, defendant Richison opened his remarks by emphasizing that Paycom had "ended 2022 with very strong results" and then had "high-level expectations for 2023." Asked during the Q&A session what was driving the Company's increased EBITDA, which "beat in the quarter, $18 million, [a] 6% beat," defendant Richison attributed "BETI clients generat[ing] ***higher-quality revenue***," saying "[s]o we saw a little bit of that."  Defendant Richison also responded to another question about what percentage of clients had then adopted Beti by stating that "[w]e're around 50% . . . . about where we were when we reported in November.

- 11 -

30.     On March 17, 2023, Paycom issued its 2023 Proxy Statement to stockholders which contained a letter from defendant Richison again emphasizing in its "2022 Highlights" section that Paycom had "delivered outstanding results in 2022, with *accelerating revenue growth* and *robust margins*."

31.     On May 2, 2023, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 1Q23 financial results.  In addition to reporting "[r]evenues of $452 million, up 28% from the comparable prior year period," and "GAAP [n]et [i]ncome of $119 million," the release quoted defendant Richison as stating that "'[r]esults for the first quarter of 2023 were excellent, with *robust revenue growth* from new clients and *expanding margins*.'"  He further emphasized Paycom's "'unique value proposition, particularly with Beti,'" while again concealing the negative impact increased Beti adoption was having on Paycom's own financial results.  As to financial guidance, for the second quarter 2023 ending June 30, 2023 ("2Q23"), Paycom projected "[t]otal [r]evenues in the range of $397 million to $399 million" and "[a]djusted EBITDA in the range of $152 million to $154 million."  For the fiscal year ending December 31, 2023 ("FY23"), Paycom projected "[t]otal [r]evenues in the range of $1.713 billion to $1.715 billion" and "[a]djusted EBITDA in the range of $717 million to $719 million."

32.     During the conference call held with investors and stock analysts that later afternoon, defendant Richison again attributed the "*strong recurring revenue growth* from new clients" as driving the record revenues, while concealing the increasing negative financial impact increased Beti adoption was then having on Paycom.  Instead, during his opening remarks, defendant Boelte stated that "[f]or fiscal 2023, we are *raising our outlook* and now expect revenue in the range of $1.713 billion to $1.715 billion or approximately 25% year-over-year growth at the midpoint of the range," and now "expect adjusted EBITDA in the range of $717 million to $719 million, representing an

adjusted EBITDA margin of approximately 42% at the midpoint." Defendant Boelte also stated that "[i]n 2023, we project Paycom will generate greater than $1.7 billion in revenues, over $700 million in adjusted EBITDA and strong operating cash flow, *all of which continue to grow*."

33.     Later during the Q&A portion of the call, asked by a stock analyst "how much more efficient is an incremental Beti sale than a traditional one," and what its effect was expected to have on "free cash flow," defendant Richison responded implicitly, if not expressly, claiming that increased Beti adoption was at least neutral if not positive to Paycom's own profit margins, stating in pertinent part that "on the margin, they require less service for us to be able to provide them and less services around what I would call more of our *low-margin* activities, which is going to be amending – amended returns and other issues that could come out by having payroll done wrong."

34.     On August 1, 2023, after the close of trading, Paycom issued a press release and conducted a conference call announcing its 2Q23 financial results.  In addition to reporting "[r]evenues of $401 million, up 27% from the comparable prior year period" and "[n]et [i]ncome of $65 million," the release quoted defendant Richison as stating in pertinent part that Paycom "'delivered another strong quarter, which was highlighted by *strong revenue growth* and *margin expansion*,'" despite that Paycom's gross margin had again declined from 84.2% in 2Q22 to 83.2% in 2Q23.  As to financial guidance, for its third quarter 2023 ending September 30, 2023 ("3Q23"), Paycom projected "[t]otal [r]evenues in the range of $410 million to $412 million" and "[a]djusted EBITDA in the range of $156 million to $158 million."  For FY23, Paycom again raised its financial guidance, now projecting "[t]otal [r]evenues in the range of $1.715 billion to $1.717 billion" and "[a]djusted EBITDA in the range of $722 million to $724 million."

35.     During the conference call held with investors and stock analysts later that afternoon, defendant Richison continued extolling the benefits that further Beti adoption was having on

Paycom's payroll customers while concealing the negative financial impacts to Paycom, instead expressly maintaining that increased Beti adoption was actually "working" exactly as defendants had "anticipated."   Asked later during the call about the cause of the year-over-year decline in gross margins, defendant Boelte blamed increased head count "ahead of the growth" and said investors could continue to expect gross revenues in the 84%-86% range in the future, stating in pertinent part as follows:

> [Boelte:]  Yes.  I mean this quarter was down slightly.  It's typically going to be headcount.  We hire ahead of the growth.  It's going to be a higher headcount in the service group.  We're starting to see a few costs as it relates to international, but it's not really moving the needle at this point.  So we haven't guided to gross margins.  **We've always been in that 84%, 85%, 86% range, and we would expect that to be similar moving forward**.

36.     Yet because the projected range of $410 million to $412 million for 3Q23 revenues was slightly below the $412 million the market had been led to expect based on defendants' bullish Class Period statements, and because 3Q23 adjusted gross margin had contracted 100 basis points on a year-over-year basis, the market price of Paycom common stock declined nearly $71 per share – *or almost 20%* – when trading resumed on August 2, 2023, falling from its close of $369.51 per share on August 1 to close down at $298.59 on August 2, on unusually high volume of more than 2.4 million shares trading, or more than five times the average daily trading over the preceding ten trading days.  However, as defendants failed to disclose the reason the revenue guidance was softening and the gross margins were falling, the market price of Paycom common stock remained artificially inflated throughout the rest of the Class Period.

37.     The statements in ¶¶15-16 and 18-35 above were materially false and misleading at the time they were made and/or omitted to state required material information because they failed to disclose the following adverse information that was then known to defendants or recklessly disregarded by them:

(a)     that Paycom had been relying upon a significant, but undisclosed, amount of one-off payroll correction fees to fuel its past outsized revenue growth;

(b)     that increased adoption of Beti by Paycom's payroll customers was cannibalizing the fees the Company had previously been charging to correct common payroll mistakes and to provide related services;

(c)     that the increased Beti adoption was decreasing Paycom's gross profit margins; and

(d)     that, as a result of the foregoing, defendants' statements about Paycom's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

38.     On October 31, 2023, after the close of trading, in connection with reporting the Company's underwhelming 3Q23 financial results, Paycom finally expressly admitted that increased Beti adoption had been cannibalizing the one-off fees the Company had previously been receiving for correcting payroll errors, and finally admitted just how much the Company had been relying on those additional payroll correction fees to support its past outsized revenue growth.  Rather than 3Q23 revenues "in the range of $410 million to $412 million" as projected on August 1, 2023, Paycom reported 3Q23 revenues of just $406 million.  Defendants also reduced Paycom's annual FY23 financial guidance after just raising it on August 1, 2023.  Rather than FY23 revenue guidance "in the range of $1.715 billion to $1.717 billion" projected on August 1, 2023, Paycom now only expected "$1.679 billion to $1.684 billion," and rather than the "[a]djusted EBITDA in the range of $722 million to $724 million," Paycom now only expected "$712 million to $717 million." Highlighting that Paycom's revenue growth rates were indeed slowing because of Beti adoption, management warned that in the upcoming fourth quarter 2023 ("4Q23"), revenues would increase

less than 15%, and would increase only 10% to 20% in fiscal 2024, a much lower growth rate than that experienced in the past.  Paycom's 3Q23 adjusted gross margin also contracted another 20 basis points year-over-year to 83.7%, well below the continuing 84%-86% signaled on August 1, 2023, and demonstrating a downward trend:



39.     Defendant Boelte admitted on the conference call held with stock analysts and investors that afternoon that as so many of Paycom's payroll customers had switched to the Company's Beti automated payroll system, it had "eliminated certain billable items, which [he said was] *cannibalizing a portion of our services and unscheduled revenues*."  He further admitted that the Company knew or should have known that Beti adoption would lead to cannibalization of service revenues throughout the Class Period, stating that "[w]ith 10 months of data from increased Beti usage, we are incorporating *the impact our clients' ROI achievement has on our model*."

40.     The market price of Paycom common stock crashed on this news, declining another $94.08 per share – *or 38.5 %* – from its close of $244.45 per share on October 31, 2023 to close

down at $150.37 per share on November 1, 2023, again on unusually high trading volume of more

than eleven million shares trading, or almost four times the average daily volume over the preceding

ten trading days.  Paycom common stock had not traded this low since 2019.  And the stock

analysts – who had not seen all of this coming – were flabbergasted, with at least nine slashing their

investment ratings on the stock in their client notes issued during the ensuing few days:

- ***Jefferies***:  "While investors were braced for soft results and guidance, PAYC shocked everyone by providing an initial 2024 outlook for 10-12% rev growth. Mgmt largely attributed the [second half] weakness and 2024 outlook to ***cannibalization of services revenue*** . . . ."

- ***Jefferies***:  "Broadly speaking, PAYC's view for years has been that adopting and utilizing BETI would result in less payroll processing errors for companies, and consequently it would reduce the costs to fix said errors. ***What we did not appreciate (and seems like investors as well) was that the costs incurred by companies was driving a meaningful revenue stream for PAYC*** [emphasis in original]. . . . ***Mgmt did not size what % of recurring revenue comes from these fees, but clearly it is significant enough to materially impact the growth rate through the end of 2024***."

- ***BofA Securities***:  "Our prior Buy rating was informed by what we thought was ***a sustainable growth trajectory of 20%+***.  This however is no longer the case, and we think there will likely be ***lingering questions surrounding how much after-the-fact payroll corrections were contributing to growth and what a sustainable LT growth rate looks like beyond C24***."

- ***Wolfe Research***:  "The [miss and guidance downgrade] explanation, ***which we found difficult to understand***, centered around Beti adoption driving the elimination of many variable payroll errors (ex: voided checks, correction payroll runs, tax adjustments, etc.), with increasing Beti usage accelerating the negative impact. . . . ***Our biggest issue is that we cannot quantify the amount of recurring revenue associated with these seemingly redundant and non-value additive activities***, which is why we are downgrading."

- ***Deutsche Bank Research***:  Downgraded Paycom from Buy to Hold, adding Beti is "saving [customers] money on services and unscheduled payroll runs, [***which is***] ***negatively impacting monetization opportunities for Paycom***."

- ***BMO Capital Markets***:  "The challenges facing Paycom are now fully exposed following the ***3Q miss and guide down for 2024***."

- ***Morningstar***:  "Paycom's laser focus on driving automation and self-service payroll appears to have become ***a double-edged sword for the firm***."

- 17 -

- **TD Cowen**:  "With higher uncertainty and lower visibility, we do not have a basis to recommend the shares."

## ADDITIONAL SCIENTER ALLEGATIONS

41.     As alleged herein, Paycom and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Paycom, their control over, and/or receipt and/or modification of Paycom's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Paycom, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

42.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants include omissions of material fact for which there was a duty to disclose.

43.     Plaintiff will also rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Paycom common stock traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Paycom common stock; and

(e)      plaintiff and other members of the Class purchased Paycom common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

44.      At all relevant times, the market for Paycom common stock was efficient for the following reasons, among others:

(a)      Paycom common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)      as a regulated issuer, Paycom filed periodic public reports with the SEC; and

(c)      Paycom regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**LOSS CAUSATION/ECONOMIC LOSS**

45.      During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Paycom common stock and operated as a fraud or deceit on Class Period purchasers of Paycom common stock by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Paycom common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Paycom common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Paycom common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

47.    The members of the Class are so numerous that joinder of all members is impracticable.  Paycom common stock was actively traded in the United States on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Paycom or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Paycom; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

51.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

52.      Plaintiff incorporates ¶¶1-51 by reference.

53.      During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Paycom common stock during the Class Period.

55.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Paycom common stock.  Plaintiff and the Class would not have purchased Paycom common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

56.      Plaintiff incorporates ¶¶1-55 by reference.

57.      The Individual Defendants acted as controlling persons of Paycom within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Paycom securities, the Individual Defendants had the power and authority to cause Paycom to engage in the wrongful conduct complained of herein.  Paycom controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: December 21, 2023

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

- 23 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Chris H. Caloto ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>21</u> day of December, 2023.



_____

Chris H. Caloto

PAYCOM

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>**Acquired** | Amount of<br>**Shares Acquired** | **Price** |
|---|---|---|
| 02/28/2023 | 20 | $290.00 |
| 03/10/2023 | 20 | $270.00 |
| 08/03/2023 | 50 | $289.00 |
| 08/04/2023 | 40 | $291.00 |

Prices listed are rounded up to two decimal places.